IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| KIARAN YOUNG, | ) | CASE NO.  1:24-CV-00663-JPC |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE J. PHILIP CALABRESE |
| vs. | ) | UNITED STATES DISTRICT JUDGE |
| | ) | |
| WARDEN ANTHONY DAVIS, | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| Defendant. | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| | ) | |

This matter is before the magistrate judge pursuant to Local Rule 72.2.  Before the Court is the Petition of Kiaran Young ("Young" or "Petitioner"), for a Writ of Habeas Corpus filed pursuant to 28 U.S.C. § 2254. Young is in the custody of the Ohio Department of Rehabilitation and Correction pursuant to journal entry of sentence in the case *State v. Young*, Cuyahoga County Court of Common Pleas Case No. CR-17-624427-B.  For the following reasons, the undersigned recommends that the Petition be DENIED.

## I.    Summary of Facts

In a habeas corpus proceeding instituted by a person in custody pursuant to the judgment of a state court, factual determinations made by state courts are presumed correct unless rebutted by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *see also Franklin v. Bradshaw*, 695 F.3d 439, 447 (6th Cir. 2012); *Montgomery v. Bobby*, 654 F.3d 668, 701 (6th Cir. 2011).  The state appellate court summarized the facts underlying Young's conviction as follows:

> {¶ 2} This appeal arises from a series of crimes committed by appellant and four codefendants in October and November 2016.
>
> {¶ 3} The first incident occurred on October 12, 2016, and involved the theft of a motor vehicle. Orokya Ouedrago was stopped for gas at a Shell gas

1

station on the corner of Lee and Harvard Roads. She went inside the station to pay and left her keys inside her 2014 black Ford Focus. When she returned to the vehicle, she saw a light-skinned black male with dreadlocks enter and drive away in her vehicle.

{¶ 4} Ms. Ouedrago reported the car as stolen to Cleveland police and later identified appellant from a photo lineup. Her vehicle was recovered, and clothing in the vehicle contained appellant's DNA.

{¶ 5} The next incident involved a carjacking, which occurred on October 31, 2016. Shavanna Wesley was driving to the Walmart at the Steelyard Commons and was traveling down Miles Road. At the time, she was driving a 2016 silver Ford Escape, which was a rental car. As she was driving, a car, which she described as smaller, "like a Ford or something," which may have been black, bumped her vehicle from behind. She got out to observe the damage, leaving the keys in the vehicle and the Ford Escape running.

{¶ 6} Wesley testified that appellant was the driver of the vehicle that hit her, and a second, darker skinned man got out and put a gun to her face and said, "I need that." The man then got into her Ford Escape, and both vehicles drove away.

{¶ 7} She walked to a nearby convenience store and called the police from her cell phone. Ms. Wesley's vehicle was recovered a week later. The license plates from the rental company had been replaced with plates registered to appellant's grandmother.

{¶ 8} Ms. Wesley was unable to identify appellant from photo arrays provided to her by detectives. However, during her testimony, she was asked if she saw the driver of the vehicle that hit her in the courtroom. She stated that she did and described what he was wearing — a black shirt, blue mask, and dreads. When questioned on cross-examination about her inability to initially identify appellant in the photo array, Ms. Wesley stated that she was shaken up in the days following the incident, but the event has replayed in her head in the five years since.

{¶ 9} The next incident also occurred on October 31, 2016, in the afternoon, and involved a shooting. Deandre Veal, Kyara Graves, their two young children, D.V. and K.V., and Kyara's cousin, Javon Graves, were driving on Harvard Road when they passed a black Ford Focus that was stopped in the street. The Focus began following them slowly. Mr. Veal drove to the Shell gas station at the intersection of Lee and Harvard Roads and parked to see if he was being followed. The black Focus pulled in behind them.

{¶ 10} Mr. Graves exited the vehicle and went into the store of the gas station. Mr. Veal observed a man, with long dreadlocks and a tattoo on his cheek, exit

the Focus's passenger side and cross the street. The individual then retrieved a handgun from the bus stop across the street and returned to the Focus.

{¶ 11} Mr. Veal got Mr. Graves back into the car and tried to leave the gas station parking lot and lose the Focus in traffic. Both cars came to a stop light, and the occupants of the Focus brandished guns and told Mr. Veal to pull over to a side street. The occupants of the vehicle included the driver, the man with dreadlocks that Mr. Veal saw retrieving the firearm, and a man in a clown mask sitting in the back seat.

{¶ 12} Ms. Graves told them that they would not pull over and that there were kids in the car. Mr. Veal heard someone say something about "purging," which he understood to be a reference to the movie.[] As Mr. Veal began to speed away, the driver began shooting at his car. Five shots rang out before the Focus turned onto a side street. Mr. Graves and K.V., who was only 19 months old, had both been shot. K.V. had been shot in the shoulder, and Mr. Graves was shot in the chest.

{¶ 13} Mr. Veal met with police at the hospital and later met with detectives, who administered a photo array. Mr. Veal identified appellant with 75 percent certainty as the man with dreadlocks who retrieved the firearm. Ms. Graves identified appellant with 90 percent certainty.

{¶ 14} The next incident occurred on November 2, 2016. Garfield Heights Police Officer Patrick Monnolly observed a silver Ford Escape (later identified as the vehicle stolen from Ms. Wesley) with a Maryland license plate. He ran the plate, which came up as stolen; he then notified dispatch. Later that day, he again observed the silver Escape and began to follow it. The silver Escape was driving together with a black Ford Focus (later identified as the one stolen from Ms. Ouedrago). Ofc. Monnolly activated his lights and siren and began to pursue the Escape.

{¶ 15} The Focus and the Escape both attempted to evade Ofc. Monnolly. After a short pursuit, the Focus crashed into another vehicle. Ofc. Monnolly saw the driver of the Focus, a black male with dreadlocks, get into the Escape and flee the scene.

{¶ 16} The Focus was towed from the scene, and police retrieved evidence from the vehicle, including two cell phones, two handgun magazines, a box of shotgun shells, and clothing. DNA on the clothing matched that of appellant.

{¶ 17} The next incident occurred on November 2, 2016, and involved another carjacking. Curtis Davis left his house to play the lottery. His daughter, Ciara Ware, heard tires screeching in the parking lot adjacent to her father's house. Davis then came to the house and told her that he had been robbed. Mr. Davis's black Ford Escape had been stolen from him.

3

{¶ 18} The two called the police. Detectives later administered a photo array, and Davis identified the robber as appellant's codefendant, William Cannon, with 45-50 percent certainty.

{¶ 19} On November 8, 2016, B.S., who was a minor at the time of the incident, was walking to pick up his paycheck when he saw a black SUV (later identified as Mr. Davis's black Ford Escape) circle him suspiciously in the street. There were three people in the SUV. The Escape then stopped in a driveway ahead of B.S., causing him to walk around the vehicle. When he did, a man with a gun came around from the other side of the Escape and pointed the gun in B.S.'s face. This man was later identified as codefendant Brico Allen ("Allen"). Allen told B.S. to get into the Escape and pushed him in by his shoulder. The SUV was driven by a light-skinned black man with dreadlocks.

{¶ 20} Allen told B.S. to give him everything he had and that he did not want to hurt him. B.S. heard someone in the front of the vehicle suggest taking B.S. to their trap house to murder him. As the SUV drove, the driver turned around and struck B.S. with the handgun he was holding. The men robbed B.S. of his shoes, phone, and hoodie, and then ejected him at gunpoint onto the sidewalk.

{¶ 21} B.S. called his mother and police from a friend's house. When he spoke with police, he stated that he recognized Allen from social media and a news story involving Allen recently stealing a police car. He did not recognize the driver or front passenger.

{¶ 22} B.S. met with detectives several days later and was presented with a photo array. He identified Allen with 75 percent certainty and identified appellant with 50 percent certainty as the light-skinned man with dreadlocks who drove the vehicle. B.S. testified that he was less certain about appellant's identification because he only saw him when appellant turned around to pistol whip him.

{¶ 23} The next incident occurred on November 9, 2016, where Frederick Sims heard gunfire directed toward his vehicle. It was later determined that the shots came from the black Ford Escape, the vehicle stolen from Mr. Davis.

{¶ 24} That same day, officers located the black Ford Escape at a shopping plaza at Lee and Harvard Roads. Officers attempted to pull the vehicle over, driving behind it with lights and sirens activated, but ultimately lost sight of the vehicle. The officers identified the driver of the vehicle as a light-skinned black male with dreads.

{¶ 25} The following day, the black Ford Escape was recovered, and appellant's cell phone was found inside the vehicle.

{¶ 26} Another incident occurred on November 10, 2016. J.F., who was 15 years old at the time of the incident, testified as to events that he reported to

4

police. He had difficulty remembering the incident and was questioned about not wanting to "snitch." He was permitted to utilize the statement he had made to police on the day of the incident.

{¶ 27} On the day in question, J.F. was walking to school when a silver truck pulled up and a dark-skinned male outside the truck had a gun and told him to get into the truck. The man took his phone and told him to take off his belt and shoes. He was then dropped off on a different street.

{¶ 28} J.F. stated that the driver was a light-skinned black male with dreads and a cross tattoo under his eye. He identified appellant from a photo array with 50 percent certainty.

{¶ 29} In the next incident, Deborah Papp heard a loud pounding on her front door on the morning of November 14, 2016. She did not answer and then heard a similar pounding at her side door. She ran to her back bedroom to look out the window and see the individual doing the pounding. She then heard the door being kicked in and yelled that she had called the police and that they were on their way. She next heard tires screeching. She saw the individual she had observed leaving in a car and saw others in the car with him. She described the individual as young, medium to light-skinned black man with dreadlocks. The police came and she was presented with a photo array; she identified appellant with 100% certainty as the individual who kicked in her door.

{¶ 30} Jazmine Strozier was across the street visiting her grandmother at the time that Ms. Papp's door was kicked in. She saw two people attempting to break into the house, one with dreadlocks. She further observed the individuals get into a silver vehicle and drive away.

{¶ 31} The following day, on November 15, 2016, Garfield Heights Police Lieutenant David Bailey responded to reports of two males fleeing from a stolen vehicle. One of the individuals was thought to be appellant. Lt. Bailey arrived in his vehicle at the Garfield Park Reservation and observed appellant and his codefendant William Cannon run out of the park and split up. Lt. Bailey recognized appellant from a photograph posted at the Garfield Heights Police Department. He observed appellant reaching for his waistband and yelled for him to stop. Appellant withdrew a handgun from his waistband and ran into the woods.

{¶ 32} Cleveland Metroparks Patrolman Michael Kort responded to a reported foot chase. He caught up to Lt. Bailey and another officer, who warned him that appellant had run into the woods and had a handgun. Kort, Bailey, and the other officer split up to pursue appellant. Kort spotted appellant who had fallen into a pool of muddy water. Kort shouted at appellant to show his hands, which were beneath the water.

5

{¶ 33} Appellant eventually complied and officers pulled him out of the mud and took him into custody. At the time of his arrest, appellant was wearing the belt taken from J.F.

{¶ 34} Appellant was interviewed by Detective Phillip Herron at the Garfield Heights police station. Appellant admitted to driving the silver SUV during the robbery of J.F., acknowledged spending time and committing crimes with Allen, Cannon, and an individual named Mike, and admitted to driving the Ford Focus during the police chase on November 2, 2016, and then getting into the silver Ford Escape.

{¶ 35} Appellant and his codefendants were indicted on a total of 113 counts. Appellant was charged in 54 of the 113 counts on charges of engaging in a pattern of corrupt activity, attempted aggravated murder, aggravated robbery, kidnapping, discharge of a firearm on prohibited premises, felonious assault, conspiracy, burglary, robbery, failure to comply, having weapons while under disability, receiving stolen property, and grand theft of a motor vehicle, along with accompanying firearm specifications.

{¶ 36} Five counts of having weapons while under disability were tried to the court and the rest of the charges were tried to a jury. The state presented the testimony of 42 witnesses and offered evidence including, inter alia, text messages between appellant and his codefendants, Facebook records, photographs, photo arrays, and DNA evidence. At the close of the state's case, appellant moved for a Crim.R. 29 acquittal, which the court denied. Appellant renewed his motion after all evidence had been presented, which was again denied.

{¶ 37} In response to the defense's Crim.R. 29 motion, the state dismissed 12 of the counts. The jury found appellant not guilty of one felonious assault charge and guilty of the remaining counts, including a number of firearm specifications. On the having weapons while under disability charges, the court found appellant not guilty of three charges and guilty of two.

{¶ 38} The court imposed an aggregate prison sentence of 36 years. At the sentencing hearing, appellant was also sentenced on two other cases, Cuyahoga C.P. Nos. CR-16-605516 and CR-16-606749. The court ordered the sentence in this matter to run concurrent with the sentences imposed in the other two cases, as well as with the prison sentence that appellant was already serving for another unrelated case, Cuyahoga C.P. No. CR-16-611642. The court granted appellant 1,794 days of jail-time credit based upon the time he had already served on CR-16-611642.

*State v. Young*, 2022-Ohio-3132, 2022 WL 4100967, at **1-4 (Ohio Ct. App. Sept. 8, 2022) (footnote omitted).

6

## II.    Procedural History

### A.    Trial Court Proceedings

On January 29, 2018, the Cuyahoga County Grand Jury indicted Young on the following charges: engaging in a pattern of corrupt activity (Count 1); conspiracy (Count 2); receiving stolen property (Counts 3, 4, 12, 37, 75, 76, 82); burglary (Counts 5, 6, 102); theft (Count 7); grand theft (Count 11); aggravated robbery, with gun specifications (Counts 32, 84, 98); robbery, with gun specifications (Counts 33, 34, 85, 86, 99, 100); kidnapping, with gun specifications (Counts 35, 87, 101); grand theft, with gun specifications (Count 36); attempted aggravated murder, with gun specifications (Counts 38, 41, 44, 46, 48); felonious assault, with gun specifications (Counts 39, 40, 42, 43, 45, 47, 49, 70, 71, 72); discharge of a firearm on or near prohibited premises, with gun specifications (Counts 50, 73); felonious assault (Counts 69, 83, 88); failure to comply (Counts 74, 89); and having weapons under disability (Counts 103, 105, 108, 110, 113). (Doc. No. 6-1, Ex. 1).  Young entered pleas of not guilty to all charges.  (Doc. No. 6-1, Ex. 2).

On January 28, 2020, the trial court notified the parties that Young was awaiting trial in two additional cases, which had been set for trial on April 29, 2020.  (Doc. No. 6-1, Ex. 3.)  As the indictments were not consolidated and no party had moved for a single trial, the three cases were to be tried consecutively.  (*Id.*)

On May 18, 2021, Young, *pro se*, filed a motion to dismiss counsel.  (Doc. No. 6-1, Ex.  4.)   In his motion, Young asserted that trial counsel had not met with him for months, had been "pushing 'continuances'" to which Young had not agreed, and trial counsel had not shown Young the discovery received in the case.  (*Id.*)  Young stated he no longer wished to be represented by trial counsel and wanted to have new counsel assigned.  (*Id.*)

On May 20, 2021, Young's trial counsel filed a motion to withdraw as counsel and to appoint new counsel.  (Doc. No. 6-1, Ex. 5.)  In the motion, trial counsel stated that Young had informed counsel that

Young had filed a grievance against him.  (*Id.*)  Trial counsel asserted that it would be unethical for him to continue to represent Young.  (*Id.*)

On June 24, 2021, after a hearing (Doc. No. 6-2 at PageID# 473-87), the trial court denied both motions.  (Doc. No. 6-1, Ex. 6-7.)

On September 27, 2021, Young, through counsel, filed a waiver of jury trial for all five counts of having weapons while under disability, electing a bench trial on those counts.  (Doc. No. 6-1, Ex. 8.)

On September 29, 2021, on the State's motion, the trial court dismissed Counts 3-7 without prejudice.  (Doc. No. 6-1, Ex. 9.)

The case proceeded to jury trial on September 27, 2021.  (Doc. No. 6-2, PageID# 511.)  On October 6, 2021, the jury returned its verdict, finding Young guilty of 38 charges and not guilty of four charges.  (Doc. No. 6-1, Ex. 10-11.)

The trial court found Young guilty of two counts of having a weapon while under disability and not guilty of three counts of having a weapon while under disability.  (*Id.*)

On October 15, 2021, the state trial court held a sentencing hearing.  (Doc. No. 6-1, Ex. 13.)  The trial court found that Counts 33, 34, 35, 39, 40, 42, 43, 45, 47, 49, 85, 86, 99, and 100 were allied offenses of similar import to other charges where sentences would be imposed.  (*Id.*)  The trial court sentenced Young to 36 years of imprisonment.  (*Id.*)

**B.    Direct Appeal**

Young, through counsel, filed a timely notice of appeal to the Eighth District Court of Appeals.  (Doc. No. 6-1, Ex. 14.)  The State filed a motion for leave to cross-appeal and a notice of cross-appeal.  (Doc. No. 6-1, Ex. 15-16.)  Young filed a brief in opposition to the State's motion for leave to cross-appeal (Doc. No. 6-1, Ex. 17), to which the State replied.  (Doc. No. 6-1, Ex. 18.)  The state appellate court granted the State's motion for leave to file cross-appeal.  (Doc. No. 6-1, Ex. 19.)

8

In his appellate brief, Young raised the following assignments of error:

I.  The trial court erred by failing to grant a judgment of acquittal pursuant to Crim.R. 29(A) on various charges in the indictment, and thereafter entering a judgment of conviction of those offenses which were not supported by sufficient evidence, in derogation of appellant's right to due process of law, as protected by the Fourteenth Amendment to the United States Constitution, as well as section 16 of the Ohio Constitution.

II.  The trial court erred by entering judgments of conviction as to the various counts of the indictment that were against the manifest weight of the evidence, in derogation of Mr. Young's right to due process of law, as protected by the Fourteenth Amendment to the United States Constitution.

III.  The trial court abused its discretion and/or committed plain error, in violation of Mr. Young's due process right to a fair trial, when it ruled admissible the in-court identification of Mr. Young by Shavanna Wesley when she showed no prior ability to identify Mr. Young in an out-of-court photo lineup a few days after the incident in question.

IV.  The trial court abused its discretion and/or committed plain error, in violation of Mr. Young's due process right to a fair trial and the confrontation clause, when it admitted the Facebook records, contained in various exhibits numbered 225 through 256, which were hearsay, not authentic, and/or not business records.

V.  Trial counsel for Mr. Young provided ineffective assistance of counsel, as guaranteed by both the United States Constitution, and the Ohio Constitution, when he failed to challenge via suppression the various out-of-court identifications of Mr. Young as impermissibly suggestive, failed to object to the in-court identification of Mr. Young by Shavanna Wesley, and failed to object to the Facebook records contained in various exhibits numbered 225 through 256.

VI.  The trial court abused its discretion, in violation of Mr. Young's due process right to a fair trial, when it admitted irrelevant testimony by Kyara Graves, indicating that she had been intimidated by an unknown individual in the courthouse.

VII.  The trial court abused its discretion, in violation of Mr. Young's due process right to a fair trial, by admitting out of court statements by J.F., in violation of the hearsay rule.

VIII.  The trial court abused its discretion, in violation of Mr. Young's due process right to a fair trial, when it refused to grant the motion to withdraw and the motion to dismiss counsel, thus forcing trial counsel to defend Mr. Young when Mr. Young had an ethical grievance pending against trial counsel.

IX.  The cumulative effect of multiple errors at trial, even if singularly not sufficient to warrant reversal, together deprived appellant of a fair trial and a denial of due process.

9

(Doc. No. 6-1, Ex. 20.)  The State filed a brief in response and in support of its cross-appeal.  (Doc. No. 6-1, Ex. 21.)  Young filed a reply brief and a brief in response to the State's cross-appeal.  (Doc. No. 6-1, Ex. 22.)  The State filed a reply in support of its cross-appeal.  (Doc. No. 6-1, Ex. 23.)

On September 8, 2022, the state appellate court affirmed Young's convictions, but sustained the state's cross-assignment of error and remanded the case to the trial court for recalculation of jail time credit. (Doc. No. 6-1, Ex. 24.)  *See also State v. Young*, 2022-Ohio-3132, 2022 WL 4100967, at *1.

On October 24, 2022, Young, through counsel, filed a Notice of Appeal with the Supreme Court of Ohio.  (Doc. No. 6-1, Ex. 25.)  In his Memorandum in Support of Jurisdiction, Young raised the following Propositions of Law:

I.   Sufficient evidence of identity is not presented where out-of-court photo identifications have as little as 50% certainty, where in-court identifications are not presented in the record as identifying a specific individual, where testimony is not presented that the accused and the individual identified in the photo lineup are the same person, and when the accused's face is obscured by a face covering at the time of any in-court identification.

II.  When an attorney and client are adversaries with respect to an ethical grievance, the client cannot be forced to proceed with that adversary as their attorney at trial, for to do so would be to forfeit his Due Process right to a fair trial.

III. A trial court abuses its discretion and/or commits plain error, in violation of the Due Process right to a fair trial, when it rules admissible an in-court identification by a witness when that witness showed no prior ability to identify the alleged perpetrator when presented with an out-of-court photo lineup.

IV.  A trial court abuses its discretion and/or commits plain error, in violation of an accused's Due Process right to a fair trial and the confrontation clause, when it admits social media records that are both hearsay and not authentic.

V.   A trial court abuses its discretion, in violation of an accused's Due Process right to a fair trial, when it admits irrelevant testimony by a witness, indicating that she had been intimidated by an unknown individual in the courthouse.

(Doc. No. 6-1, Ex. 26.)  The State did not file a response.

On January 17, 2023, the Supreme Court of Ohio declined to accept jurisdiction of the appeal pursuant to S.Ct. Prac.R. 7.08(B)(4).  (Doc. No. 6-1, Ex. 27.)

C.    **Federal Habeas Petition**

On April 3, 2024,[1] Young filed a Petition for Writ of Habeas Corpus in this Court and asserted the

following grounds for relief:

> **GROUND ONE**:  There was insufficient evidence to support Petitioner's convictions, in
> violation of his due process protections under the Fourteenth Amendment to the United
> States Constitution.
>
> > **Supporting Facts**: At the close of the State's case at trial, Petitioner's defense filed
> > a Crim.R. 29 motion for acquittal, which was denied.  Defense renewed the motion
> > after all evidence had been presented and it was again denied.  However, in response
> > to the motion, the State had twelve of the counts against Petitioner dismissed.  The
> > jury found Petitioner not guilty of one of the felonious assault charges.  In a bench
> > trial for the having weapons under disability charges, the trial court found Petitioner
> > not guilty of three of the five charges.
>
> **GROUND TWO**:  Petitioner was denied due process and a fair trial, in violation of the
> Fourteenth Amendment to the United States Constitution, when the trial court ruled
> admissible the in-court identification of Petitioner by Shavanna Wesley, when she showed
> no prior ability to identify him in an out-of-court photo lineup.
>
> > **Supporting Facts**: Shavanna Wesley was unable to identify Petitioner from photo
> > arrays provided to her by detectives just several days after she was carjacked.  Yet
> > five years later at trial she was suddenly able to make an in-court identification of
> > Petitioner.  As trial took place during the COVID-19 pandemic, Petitioner wore a
> > mask over his face throughout the courtroom proceedings and was never asked to
> > remove it.
>
> **GROUND THREE:**  Petitioner was denied due process and a fair trial, in violation of the
> Sixth and Fourteenth Amendments to the United States Constitution, when the trial court
> admitted Facebook records which were both hearsay and not authentic.
>
> > **Supporting Facts**:  At trial, no authentication was made of a Facebook page
> > allegedly belonging to Petitioner, other than the testimony of Detective Bauhoff.
>
> **GROUND FOUR**:  Petitioner received ineffective assistance of counsel, in violation of
> his Sixth and Fourteenth Amendments to the United States Constitution, when trial counsel
> failed to challenge the suppression of various out-of-court identifications of Petitioner as

---

[1]  Under the mailbox rule, the filing date for a *pro se* petition is the date that a petitioner delivers it to prison
authorities.  *See Houston v. Lack*, 487 U.S. 266 (1988).  While the Petition herein did not arrive at the Court
for filing until April 12, 2024, Young states that he placed it in the prison mailing system on April 3, 2024.
(Doc. No. 1 at 17.)  Thus, the Court will consider the Petition as filed on April 3, 2024.

impermissibly suggestive, failed to object to the in-court-identification of him by Shavanna Wesley, and failed to object to Facebook records contained in various exhibits.

> **Supporting Facts**:  During trial, Petitioner's defense counsel failed to object to the in-court identification of him by Shavanna Wesley and failed to object to the court's admission of Facebook records alleged to belong to him.

**GROUND FIVE**:  Petitioner was denied due process and a fair trial, in violation of the Sixth and Fourteenth Amendments to the United States Constitution, when the trial court admitted irrelevant testimony from Kyara Graves after she indicated she had been intimidated by unknown individuals in the courthouse.

> **Supporting Facts**:  At trial, Kyara Graves testified that she had been intimated [sic] by unknown individuals inside the courthouse whom she said looked at her, sat behind her, and made her uncomfortable.  Yet she did not identify the individuals or point them out to the court.

**GROUND SIX**:  Petitioner was denied due process and a fair trial, in violation of the Sixth and Fourteenth Amendments to the United States Constitution, when the trial court admitted out-of-court hearsay statements by J.F.

> **Supporting Facts**:  Testifying at trial, alleged victim J.F. initially testified that he did not recall any of the events that had occurred when he was walking to school and was allegedly approached by individuals and robbed; nor could he recall going to the Garfield Heights Police Department with his mother and making a robbery report.  He was only able to recognize his name and writing on the top of a written statement he had given to police shortly after the alleged robbery.

**GROUND SEVEN**:  Petitioner was denied due process and a fair trial, in violation of the Sixth and Fourteenth Amendments to the United States Constitution, when the trial court refused to dismiss counsel, or allow counsel to withdraw, even after Petitioner had filed an ethics grievance against counsel.

> **Supporting Facts**:  One month before trial was set to commence, Petitioner filed a motion to dismiss defense counsel in which he asserted that counsel had not spoken with him for months, had filed continuances that he had not consented to, had not shown him the discovery received from the State, and had not been working in his best defense.  The same trial counsel also filed a motion to withdraw, partly because of Petitioner's motion to dismiss counsel, while also asserting that Petitioner had told him that Petitioner had filed a grievance against him.  Trial counsel stated that, under these circumstances, he was uncomfortable representing Petitioner, and insisted that he was ethically prohibited from continuing to represent Petitioner.  The motions filed by Petitioner and counsel were unopposed by the prosecution.  A hearing was held on the motion, where Petitioner confirmed that he had filed a grievance against counsel with the bar association.  Following the hearing, the trial court denied both Petitioner's and counsel's motions, forcing counsel to continue to represent Petitioner at trial.

**GROUND EIGHT**:  Petitioner was denied due process and a fair trial, in violation of the Sixth and Fourteenth Amendments to the United States Constitution, by the cumulative effect of multiple errors at trial.

> **Supporting Facts**:  Here, Petitioner relies upon the supporting facts presented in the first seven grounds to establish the cumulative effect of the errors cited in those earlier grounds.

(Doc. No. 1.)

On June 27, 2024, Warden Anthony Davis ("Respondent") filed the Return of Writ. (Doc. No. 6.) Young failed to file a Traverse.

### III. Exhaustion and Procedural Default

#### A.    Legal Standard

Petitioners must exhaust their state remedies prior to raising claims in federal habeas corpus proceedings.  *See* 28 U.S.C. § 2254(b), (c).  This requirement is satisfied "when the highest court in the state in which the petitioner was convicted has been given a full and fair opportunity to rule on the petitioner's claims."  *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir.1990).

Federal courts will not consider the merits of procedurally defaulted claims, unless the petitioner demonstrates cause for the default and prejudice resulting therefrom, or where failure to review the claim would result in a fundamental miscarriage of justice.  *See Lundgren v. Mitchell*, 440 F.3d 754, 763 (6th Cir. 2006) (citing *Wainwright v. Sykes*, 433 U.S. 72, 87, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977)).  A claim may become procedurally defaulted in two ways. *Id.*  First, a petitioner may procedurally default a claim by failing to comply with state procedural rules in presenting his claim to the appropriate state court.  *Id.; see also Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986).  If, due to petitioner's failure to comply with the

procedural rule, the state court declines to reach the merits of the issue, and the state procedural rule is an independent and adequate grounds for precluding relief, the claim is procedurally defaulted.[2]  *Id.*

Second, a petitioner may also procedurally default a claim by failing to raise and pursue that claim through the state's "ordinary appellate review procedures." *O'Sullivan v. Boerckel*, 526 U.S. 838, 848, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999).  If, at the time of the federal habeas petition, state law no longer allows the petitioner to raise the claim, it is procedurally defaulted. *Engle v. Isaac,* 456 U.S. 107, 125 n. 28, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982); *see also Coleman v. Thompson*, 501 U.S. 722, 731–32, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *Lovins*, 712 F.3d 283, 295 (6th Cir. 2013) ("a claim is procedurally defaulted where the petitioner failed to exhaust state court remedies, and the remedies are no longer available at the time the federal petition is filed because of a state procedural rule.")  This second type of procedural default is often confused with exhaustion.  Exhaustion and procedural default, however, are distinct concepts.  AEDPA's exhaustion requirement only "refers to remedies still available at the time of the federal petition." *Engle*, 456 U.S. at 125 n. 28.  Where state court remedies are no longer available to a petitioner because he failed to use them within the required time period, procedural default and not exhaustion bars federal court review. *Id*.  In Ohio, a petitioner is not entitled to raise claims in post-conviction proceedings where those claims could have been raised on direct appeal.  *Id.*  Thus, if an Ohio petitioner failed to raise a claim on direct appeal, which could have been raised, the claim is procedurally defaulted.  *Id.*

---

[2] In *Maupin*, the Sixth Circuit established a four-step analysis to determine whether a claim is procedurally defaulted. 785 F.2d at 135. Under this test, the Court decides (1) whether the petitioner failed to comply with an applicable state procedural rule, (2) whether the state courts actually enforced the state procedural sanction, (3) whether the state procedural bar is an "independent and adequate" state ground on which the state can foreclose federal review, and (4) whether the petitioner has demonstrated "cause" and "prejudice." *Id.* at 138–39; *Barkley v. Konteh*, 240 F. Supp.2d 708 (N.D. Ohio 2002). "In determining whether a state court actually enforced a procedural rule, we apply the 'plain statement' rule of *Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983)." *Lovins v. Parker*, 712 F.3d 283, 296 (6th Cir. 2013) ("a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on the procedural bar.") (citations omitted).

A claim is adequately raised on direct appeal if it was "fairly presented" to the state court. To fairly present a claim to a state court a petitioner must assert both the legal and factual basis for his claim. *See McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000).  Accordingly, a "petitioner must present his claim to the state courts as a federal constitutional issue-not merely as an issue arising under state law." *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984).  A petitioner can take four actions in his brief which are significant to the determination as to whether a claim has been fairly presented as a federal constitutional claim: (1) reliance upon federal cases employing constitutional analysis; (2) reliance upon state cases employing federal constitutional analysis; (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts well within the mainstream of constitutional law.  *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006).

A petitioner's procedural default, however, may be excused upon a showing of "cause" for the procedural default and "actual prejudice" from the alleged error.  *See Maupin*, 785 F.2d at 138–39. "Demonstrating cause requires showing that an 'objective factor external to the defense impeded counsel's efforts to comply' with the state procedural rule." *Franklin v. Anderson*, 434 F.3d 412, 417 (6th Cir. 2006) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). Meanwhile, "[d]emonstrating prejudice requires showing that the trial was infected with constitutional error." *Id.*  Where there is strong evidence of a petitioner's guilt and the evidence supporting petitioner's claim is weak, the actual prejudice requirement is not satisfied. *See United States v. Frady*, 456 U.S. 152, 172, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982); *Perkins v.LeCureux*, 58 F.3d 214, 219–20 (6th Cir. 1995); *Rust v. Zent*, 17 F.3d 155, 161-62 (6th Cir. 1994). Prejudice does not occur unless petitioner demonstrates "a reasonable probability" that the outcome of the trial would have been different. *See Mason v. Mitchell*, 320 F.3d 604, 629 (6th Cir. 2003) (citing *Strickler v. Greene*, 527 U.S. 263, 289, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)).

Finally, a petitioner's procedural default may also be excused where a petitioner is actually innocent in order to prevent a "manifest injustice." *See Coleman v. Thompson*, 501 U.S.722, 749–50, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).  Conclusory statements are not enough—a petitioner must "support his allegations of constitutional error with new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995).  *See also Allen v. Harry*, 497 F. App'x 473, 480 (6th Cir. 2012).

**B.**    **Application to Petitioner**

**1.**    **Ground Three**

Respondent argues that Young's third ground challenging the trial court's admission of Facebook record evidence is procedurally defaulted because his attorney failed to raise the issue with the trial court at the time.  (Doc. No. 6 at 18.)  Respondent asserts that Young's ineffective assistance of trial counsel is procedurally defaulted and therefore cannot serve as cause to excuse the default.  (*Id.*)  The state appellate court enforced the procedural bar on appeal, and Respondent maintains that the state appellate court's alternative plain error merits review does not change the fact that the claim is barred from habeas review. (*Id.* at 19.)

As Young failed to file a Traverse, Respondent's arguments are uncontroverted.

On direct appeal, Young raised an argument regarding admission of the Facebook records to the state appellate court. (Doc. No. 6-1, Ex. 20.) In its decision, the state appellate court found Young had waived this argument at the trial level and conducted a "plain error" review of the issue:

> {¶ 62} In his fourth assignment of error, appellant argues that the trial court abused its discretion or plainly erred by admitting Facebook records that were not authentic and constituted hearsay.
>
> {¶ 63} Appellant asserts that Cleveland Police Detective Shane Bauhof testified as to certain Facebook records that the state asserted were from an

16

account connected to appellant. The documents showed photographs of appellant and his associates brandishing firearms, riding in vehicles that fit the descriptions of the ones they were accused of stealing, and holding themselves out to be a gang.

{¶ 64} Appellant contends that there was no testimony as to the authenticity of the records, and Det. Bauhof simply stated that they were pages from a "search warrant result." Appellant maintains that the documents were labeled "business records," but there was no testimony to support this. Additionally, appellant asserts that the documents implicated the Confrontation Clause because they constituted testimonial statements.

{¶ 65} Appellant acknowledges that his trial counsel did object several times during the testimony in question but concedes that the objections were not based upon his arguments regarding hearsay and the Confrontation Clause. Where a party fails to object to alleged hearsay testimony, we review for plain error. *State v. Obermiller*, 147 Ohio St.3d 175, 2016-Ohio-1594, 63 N.E.3d 93, ¶ 72. Under Crim.R. 52(B), "plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." However, "'[n]otice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" *State v. Mallory*, 8th Dist. Cuyahoga No. 106052, 2018-Ohio-1846, ¶ 17, quoting *State v. Long*, 53 Ohio St.2d 91, 93, 372 N.E.2d 804 (1978), paragraph two of the syllabus. The "extremely high burden" of demonstrating plain error is on the defendant. *State v. Chapman*, 8th Dist. Cuyahoga No. 107375, 2019-Ohio-1452, ¶ 20.

{¶ 66} Pursuant to Evid.R. 901(A), the "requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Ohio courts have also held that the determination of admissibility and authentication of social media evidence is "based on whether there was sufficient evidence of authenticity for a reasonable jury to conclude that the evidence was authentic." *State v. Gibson*, 6th Dist. Lucas Nos. L-13-1222 and Lucas Nos. L-13-1223, 2015-Ohio-1679, ¶ 41.

> The hurdle the proponent of the document must overcome in order to properly authenticate a document is not great. * * * Thus, the purpose behind authentication is to connect the particular piece of evidence sought to be introduced to the facts in the case by giving some indication the evidence is relevant and reliable. The ultimate decision on the weight to be given to that piece of evidence is left to the trier of fact.

*State v. Brown*, 151 Ohio App.3d 36, 2002-Ohio-5207, 783 N.E.2d 539, ¶ 33-35 (7th Dist.).

{¶ 67} In *State v. Inkton*, 2016-Ohio-693, 60 N.E.3d 616, ¶ 72 (8th Dist.), the court admitted appellant's Facebook page into evidence, holding that "[t]here has been testimony sufficient to support, if believed, that it is what it purports to be." In *Inkton*, a detective and a codefendant testified that "there were 'numerous' pictures on appellant's Facebook page and that [they] were able to determine that appellant was in fact that person in the pictures," thus properly authenticating them. *Id.* at ¶ 78. *Compare State v. Gordon*, 2018-Ohio-2292, 114 N.E.3d 345, ¶ 71 (8th Dist.) (holding that the state failed to identify a photograph allegedly from "a Facebook page using the name Yonko Boolin" when there was no evidence linking the photograph or the social media account to the defendant, no evidence of who retrieved the photo from Facebook, and no evidence that defendant was one of the people in the photograph).

{¶ 68} In the case at hand, Det. Bauhof testified that he had monitored Facebook accounts related to appellant and his associates. In particular, he monitored an account in the name of "Bossman Pablo"; he determined that this account was operated by appellant. Det. Bauhof testified that they were being monitored in real time, checking them multiple times per day. Even though they were monitoring the Facebook accounts, the police still obtained a warrant for the actual records from Facebook. Det. Bauhof testified that Detective Lisette Gonzalez obtained the warrant and that he assisted her in reviewing some of the records.

{¶ 69} Upon review, we find that Det. Bauhof testified as to the authenticity of the photograph taken from appellant's Facebook page. There was no evidence that the Facebook page was created by anyone other than appellant, nor was there evidence that the page was fabricated or tampered with. We find that this evidence satisfies the relatively low burden of authentication.

{¶ 70} Appellant further argues that the Facebook records constituted inadmissible hearsay. We disagree.

{¶ 71} Evid.R. 801(C) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(D)(2), admission by a party-opponent, provides that a statement is not hearsay if "the statement is offered against a party and is (a) the party's own statement, in either an individual or a representative capacity * * *."

{¶ 72} In the instant matter, the Facebook records in question were admissible as a statement by a party-opponent. As outlined above, the evidence supports that the account on which the photos were posted belonged to appellant. Furthermore, the evidence supports that the photos posted on appellant's Facebook page matched photos that were extracted from his cell phone. Thus, we find that the Facebook records did not constitute inadmissible hearsay.

18

{¶ 73} Finally, appellant's argument regarding the Confrontation Clause is also without merit. The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him * * *." The Confrontation Clause generally precludes the introduction of testimonial statements at trial. *Crawford v. Washington*, 541 U.S. 36, 68-69, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Although the Supreme Court has not defined what constitutes a "testimonial" statement, it has been held to apply to "'prior testimony at a preliminary hearing, before a grand jury, or at a former trial, and responses to police interrogations.'" *State v. Dixon*, 2016-Ohio-1491, 63 N.E.3d 591, ¶ 45 (4th Dist.), quoting *State v. Mills*, 2d Dist. Montgomery No. 21146, 2006-Ohio-2128, ¶ 17. In *Crawford*, the United States Supreme Court held that "testimonial" hearsay statements may be admitted only where the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness regarding the subject matter of the statements.

{¶ 74} Appellant has not demonstrated how the Facebook records constituted testimonial statements. Accordingly, there was no violation of the Confrontation Clause, and appellant's fourth assignment of error is overruled.

*State v. Young*, 2022-Ohio-3132, 2022 WL 4100967, at **9-11.

In Ohio, a petitioner waives an alleged error when he fails to make a contemporaneous objection. *Osborne v. Ohio*, 495 U.S. 103, 124, 110 S.Ct. 1691, 109 L.Ed.2d 98 (1990) (recognizing Ohio's long-standing contemporaneous objection rule). The Sixth Circuit has held that Ohio's "contemporaneous objection rule is an adequate and independent state ground barring federal habeas review, *Biros v. Bagley*, 422 F.3d 379, 387 (6th Cir. 2005), and that plain-error review is not inconsistent with the procedural default." *Awkal v. Mitchell*, 613 F.3d 629, 648–649 (6th Cir. 2010) (citing *Lundgren*, 440 F.3d at 765); *Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001). "The state court's plain error review did not constitute a waiver of the procedural default." *Mason v. Brunsman*, 483 F. App'x 122, 130–31 (6th Cir. 2012). *See also Shafer v. Wilson*, 364 F. App'x 940, 945 (6th Cir. 2010) (finding the State of Ohio expressly enforced its contemporaneous objection rule where "the last state court to render a reasoned opinion in this case, the Ohio Court of Appeals on direct appeal, noted the failure to object, applied plain-error review, and denied [appellant's] claims for relief.")

As the state appellate court correctly noted, Young's counsel did not raise these objections to the trial court. Accordingly, the first three elements *of Maupin* test are satisfied as Young failed to comply with the contemporaneous objection rule, the state appellate court actually enforced the rule, and the rule constitutes an "independent and adequate" state ground on which the state can foreclose federal review. As set forth above, the state appellate court's plain error review did not waive the procedural default. As such, the Court finds Ground Three is procedurally defaulted.

Federal courts will not consider the merits of procedurally defaulted claims, unless the petitioner demonstrates cause for the default and prejudice resulting therefrom, or where failure to review the claim would result in a fundamental miscarriage of justice. *See Lundgren*, 440 F.3d at 763 (citing *Wainwright*, 433 U.S. at 87.) As noted above, "[d]emonstrating cause requires showing that an 'objective factor external to the defense impeded counsel's efforts to comply' with the state procedural rule." *Franklin*, 434 F.3d at 417 (6th Cir. 2006) (quoting *Murray*, 477 U.S. at 488). Prejudice does not occur unless the petitioner demonstrates "a reasonable probability" that the outcome of the trial would have been different. *See Mason*, 320 F.3d at 629. Here, Young has neither presented any cause for his default, nor has he alleged ensuing prejudice.[3] In addition, Young fails to assert actual innocence, nor has he has come forward with any new, reliable evidence to support a credible claim of actual innocence. (Doc. No. 1.)

---

[3] The Court notes that while Young raised a claim of ineffective assistance of trial counsel claim based on failure to object to the Facebook records to the state appellate court, he failed to raise this issue on appeal to the Supreme Court of Ohio. While the ineffective assistance of counsel can normally provide cause to excuse procedural default, "attorney error cannot constitute cause where the error caused a petitioner to default in a proceeding in which the petitioner was not constitutionally entitled to counsel, including a discretionary appeal." *Barkley v. Konteh*, 240 F. Supp. 2d 708, 714 (N.D. Ohio Dec. 13, 2002) (citing *Coleman v. Thompson*, 501 U.S. 722, 751-53 (1991)). Here, Young had no constitutional right to counsel on a discretionary appeal to the Supreme Court of Ohio. *Tanner v. Jeffreys*, 516 F. Supp. 2d 909, 916 (N.D. Ohio Oct. 19, 2007) (citing *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987)). Thus, any purported failure of his attorney in failing to raise certain issues on appeal to the Supreme Court of Ohio cannot serve as cause to excuse the procedural default.

Accordingly, and for all the reasons set forth above, it is recommended Ground Three be dismissed as procedurally defaulted.

### 2.    Grounds Four, Six, and Eight

In Ground Four, Young argues that he received ineffective assistance of trial counsel based on trial counsel's failure to challenge the numerous out-of-court identifications of Young as "impermissibly suggestive," failure to object to the in-court identification of Young by Shavanna Wesley, and failure to object to Facebook records in numerous exhibits.  (Doc. No. 1 at 9.)  In Ground Six, Young argues he was denied due process and a fair trial when the trial court admitted out-of-court hearsay statements by J.F.  (*Id.* at 12.)  In Ground Eight, Young argues he was denied due process and a fair trial because of the cumulative effect of multiple errors at trial.  (*Id.* at 14.)

Respondent argues that these grounds are procedurally defaulted because Young failed to present them to the Supreme Court of Ohio.  (Doc. No. 6 at 20.)  In addition, there is no cause and prejudice to excuse the default, nor has Young made a claim of actual innocence.  (*Id.* at 20-23.)

A careful review of the record reveals that while Young raised these claims to the state appellate court, he failed to present these claims to the Supreme Court of Ohio.  (Doc. No. 6-1, Ex. 20, 26.)  The Court finds Williams' failure to appeal these issues to the Supreme Court of Ohio resulted in a procedural default. Therefore, Grounds Four, Six, and Eight are procedurally barred unless Young "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice."  *Coleman*, 501 U.S. at 750.

Here, Young has neither presented any cause for his default, nor has he alleged ensuing prejudice.[4] In addition, Young fails to assert actual innocence, nor has he has come forward with any new, reliable evidence to support a credible claim of actual innocence.  (Doc. No. 1.)

## IV.  Non-Cognizable Claims

### A.  Grounds Three, Five, and Six

Respondent argues that Grounds Three, Five, and Six are non-cognizable, as hearsay, authentication issues, and relevance are matters of state law regardless of whether a petitioner uses "talismanic constitutional phrases like 'fair trial' or 'due process of law.'"  (Doc. No. 6 at 38, 45-50) (citations omitted).

"[E]rrors in application of state law, especially with regard to the admissibility of evidence, are usually not cognizable in federal habeas corpus."  *Walker v. Engle*, 703 F.2d 959, 962 (6th Cir. 1983). However, "[w]hen an evidentiary ruling is so egregious that it results in a denial of fundamental fairness, it may violate due process and thus warrant habeas relief."  *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). "[C]ourts have defined the category of infractions that violate fundamental fairness very narrowly." *Id.* (internal quotation marks and citation omitted). A state court ruling on an evidentiary matter does not rise to the level of a due process violation unless it "offend[s] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental."  *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000).

Regarding hearsay, as this Court has explained:

> To the extent Knoefel challenges the Ohio Court of Appeals determination that Lisa's statements described in Strunk's testimony about what Knoefel told him were not hearsay, Knoefel's argument is non-cognizable. *See* ECF

---

[4] Again, "attorney error cannot constitute cause where the error caused a petitioner to default in a proceeding in which the petitioner was not constitutionally entitled to counsel, including a discretionary appeal." *Barkley*, 240 F. Supp. 2d at 714.  Here, Young had no constitutional right to counsel on a discretionary appeal to the Supreme Court of Ohio.  *Tanner*, 516 F. Supp. 2d at 916.  Thus, any purported failure of his attorney in failing to raise certain issues on appeal to the Supreme Court of Ohio cannot serve as cause to excuse the procedural default.

Doc. 9 at 13; *Estelle v. McGuire*, 502 U.S. 62, 67-68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). This is because hearsay for purposes of Ohio cases is defined under the Ohio Rules of Evidence, and the Ohio Court of Appeals specifically determined that the challenged statement was not hearsay (and was not otherwise inadmissible) under the Ohio Rules of Evidence. *See* ECF Doc. 7-1 at 218-19; *State v. Knoefel*, 2015-Ohio-5207 at ¶¶116-18; Ohio Evid. R. 101(A) ("These rules govern proceedings in the courts of this state."); Ohio Evid. R. 801, *et seq.* (hearsay and its exceptions). And this court is bound by the Ohio courts' interpretation of Ohio law. *Olsen v. McFaul*, 843 F.3d 918, 929 (6th Cir. 1988); *Olsen v. McFaul*, 843 F.3d 918, 929 (6th Cir. 1988).

Likewise, whether or not the Ohio Court of Appeals reasonably determined that the admission of the hearsay (or evidence subject to exclusion under Ohio R. Evid. 403) was harmless is also not cognizable. *Estelle*, 502 U.S. at 67-68, 112 S.Ct. 475. Again, this is because the Ohio Court of Appeals specifically reviewed whether *violations of Ohio law* were harmless *under Ohio law*. *See* ECF Doc. 7-1 at 218-19; *State v. Knoefel*, 2015-Ohio-5207 at ¶¶116-18. And although we would be bound by that conclusion if it were to review the non-cognizable issue of whether the admission of such evidence violated the Ohio Rules of Evidence, *Olsen*, 843 F.3d at 929, the Ohio Court of Appeals' determination that any violation of the Ohio Rules of Evidence was harmless isn't particularly relevant to the actually cognizable constitutional issue presented in Knoefel's Ground Two claim, *cf. Idaho v. Wright*, 497 U.S. 805, 821-27, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990) (evidence was admissible under a state law hearsay exception, but still violated the Confrontation Clause); *accord Lilly v. Va.*, 527 U.S. at 116, 137-38, 119 S.Ct. 1887 (1999).[ ] Thus, any part of Knoefel's Ground Two claim that challenges the Ohio courts' conclusions that Lisa's statement was not hearsay and that any violation of the Ohio Rules of Evidence was harmless is non-cognizable. *Estelle*, 502 U.S. at 67-68, 112 S.Ct. 475.

*Knoefel v. Phillips*, Case No. 1:20-cv-1529, 2021 WL 8894449, at *24 (N.D. Ohio Apr. 23, 2021) (emphasisi in original) (footnote omitted), *report and recommendation adopted by* 2022 WL 2193442 (N.D. Ohio June 17, 2022).

Here, like in *Knoefel*, the state appellate court found the Facebook records and the statements by J.F. were not inadmissible hearsay.  *State v. Young*, 2022-Ohio-3132, 2022 WL 4100967, at **9-13.  In addition, the state appellate court found that the Facebook records were properly authenticated.  *Id.* at **9-10. Regarding Ms. Graves' testimony regarding intimidation by unknown persons in the courthouse, the state

23

appellate court found this testimony relevant to credibility and the circumstances under which Ms. Graves was testifying.  *Id.* at **11-12.  Furthermore, Ms. Graves testified the intimidation did not affect her testimony and she had no reason to think these individuals were affiliated with Young.  (Doc. No. 6-2, PageID# 942-43, 945.)  Young does not explain how the admission of this evidence at his trial was so egregious that it was fundamentally unfair.  *See Walker*, 703 F.2d at 962.  Accordingly, the undersigned recommends that in addition to being procedurally defaulted, Grounds Three and Six are non-cognizable and should be dismissed.  The undersigned further recommends that the Court find Ground Five non-cognizable and dismiss this claim.

## B.  Ground Eight

In Ground Eight, Young argues he was denied due process and a fair trial under the Sixth and Fourteenth Amendments "by the cumulative effect of multiple errors at trial."  (Doc. No. 1 at 14.)

Respondent argues that in addition to being procedurally defaulted, this ground is non-cognizable on federal habeas review.  (Doc. No. 6 at 55-56.)

The Sixth Circuit recently reaffirmed the unavailability of cumulative error as a ground for habeas relief: "Lastly, Stober claims that the cumulative effect of the alleged errors he identifies should entitle him to relief, but this court has held that 'post-AEDPA [(Antiterrorism and Effective Death Penalty Act)], not even constitutional errors that would not individually support habeas relief can be cumulated to support habeas relief.' *Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005); *see also Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002) ("The Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief.")." *Stober v. Warden*, No. 19-3980, 2020 WL 1698589, at *4 (6th Cir. February 18, 2020). Therefore, Ground Eight is non-cognizable.

## V. Review on the Merits

**A.      Legal Standard**

This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254.  *See Lindh v. Murphy*, 521 U.S. 320, 326-27, 337 (1997).  The relevant provisions of AEDPA state:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (1996).

Clearly established federal law is to be determined by the holdings (as opposed to the dicta) of the United States Supreme Court.  *See Parker v. Matthews*, 567 U.S. 37, 132 S.Ct. 2148, 183 L.Ed.2d 32 (2012); *Renico v Lett*, 559 U.S. 766, 130 S.Ct. 1855, 1865-1866 (2010); *Williams v. Taylor*, 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *Shimel v.Warren,* 838 F.3d 685, 695 (6th Cir. 2016); *Ruimveld v. Birkett*, 404 F.3d 1006, 1010 (6th Cir. 2005).  Indeed, the Supreme Court has indicated that circuit precedent does not constitute "clearly established Federal law, as determined by the Supreme Court."  *Parker*, 567 U.S. at 48-49; *Howes v. Walker*, 567 U.S. 901, 132 S.Ct. 2741, 183 L.Ed.2d 612 (2012).  *See also Lopez v. Smith*, —— U.S. ——, 135 S.Ct. 1, 4, 190 L.Ed.2d 1 (2014) (per curiam) ("Circuit precedent cannot 'refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that this Court has not announced.'" (quoting *Marshall v. Rodgers*, 569 U.S. 58, 133 S.Ct. 1446, 1450, 185 L.Ed.2d 540 (2013)).

A state court's decision is contrary to clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. at 413.  By contrast, a state court's decision involves an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*.  *See also Shimel*, 838 F.3d at 695.  However, a federal district court may not find a state court's decision unreasonable "simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly." *Williams v. Taylor,* 529 U.S. at 411.  Rather, a federal district court must determine whether the state court's decision constituted an objectively unreasonable application of federal law.  *Id.* at 410-12.  "This standard generally requires that federal courts defer to state-court decisions." *Strickland v. Pitcher*, 162 F. App'x 511, 516 (6th Cir. 2006) (citing *Herbert v. Billy*, 160 F.3d 1131, 1135 (6th Cir. 1998)).

In *Harrington v. Richter*, 562 U.S. 86, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011), the Supreme Court held that as long as "fairminded jurists could disagree on the correctness of the state court's decision," relief is precluded under the AEDPA.  *Id.* at 786 (internal quotation marks omitted).  The Court admonished that a reviewing court may not "treat[ ] the reasonableness question as a test of its confidence in the result it would reach under *de novo* review," and that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id*. at 785.  The Court noted that Section 2254(d) "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems" and does not function as a "substitute for ordinary error correction through appeal." *Id*. (internal quotation marks omitted).  Therefore, a petitioner "must show that the state court's ruling ... was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for

fairminded disagreement." *Id*. at 786–87.  This is a very high standard, which the Supreme Court readily acknowledged.  *See id.* at 786 ("If this standard is difficult to meet, that is because it is meant to be.")

### 1.    Ground One

In his first ground for habeas relief, Young argues that there was insufficient evidence to support his convictions, in violation of his due process rights under the Fourteenth Amendment.  (Doc. No. 1 at 6.)  In support, Young asserts:

> At the close of the State's case at trial, Petitioner's defense filed a Crim.R. 29 motion for acquittal, which was denied.  Defense renewed the motion after all evidence had been presented and it was again denied.  However, in response to the motion, the State had twelve of the counts against Petitioner dismissed. The jury found Petitioner not guilty of one of the felonious assault charges. In a bench trial for the having weapons under disability charges, the trial court found Petitioner not guilty of three of the five charges.

(*Id.*)

Respondent argues that "there was indeed sufficient evidence" to sustain Young's convictions, and the "state appellate court's reasonable decision rejecting this ground is entitled to AEDPA deference."  (Doc. No. 6 at 25.)

As Young failed to file a Traverse, Respondent's arguments are unopposed.

Young raised a sufficiency of the evidence claim to both the state appellate court and the Supreme Court of Ohio.  (Doc. No. 6-1, Ex. 20, 26.)  The state appellate court considered this claim on the merits and rejected it as follows:

> {¶ 41} In his first assignment of error, appellant argues that his convictions were not supported by sufficient evidence. Where a party challenges the sufficiency of the evidence supporting a conviction, a determination of whether the state has met its burden of production at trial is conducted. *State v. Hunter*, 8th Dist. Cuyahoga No. 86048, 2006-Ohio-20, ¶ 41, citing *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997). An appellate court reviewing sufficiency of the evidence must determine "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259,

574 N.E.2d 492 (1991), paragraph two of the syllabus. With a sufficiency inquiry, an appellate court does not review whether the state's evidence is to be believed but whether, if believed, the evidence admitted at trial supported the conviction. *State v. Starks*, 8th Dist. Cuyahoga No. 91682, 2009-Ohio-3375, ¶ 25, citing *Thompkins* at 387, 678 N.E.2d 541. A sufficiency of the evidence argument is not a factual determination, but a question of law. *Id.*

¶ 42} Appellant does not dispute that any of the crimes in question occurred, but he argues that there was insufficient evidence of his identity. He argues that the state failed to prove beyond a reasonable doubt his identity as the person who actually committed the crimes in question. Specifically, appellant raises the following identification issues:

> ** Ms. Ouedrago — made an out-of-court identification of appellant but did not testify that the person identified in the photo lineup was the same person on trial in the courtroom.

> ** Ms. Wesley — was unable to identify appellant in a photo lineup but was able to identify an individual in the courtroom as the driver she believed to be involved. The record does not reflect that she identified appellant.

> ** Mr. Veal — testified that he saw a chubby man that was 5'8" or 5'9" with a face tattoo and made an out-of-court photo identification of Kiaran Young with 75% certainty. He did not make an in-court identification.

> ** Ms. Graves — made an out-of-court identification of Kiaran Young with 90% certainty. She was unable to make an in-court identification.

> ** Mr. Graves — never identified appellant.

> ** Appellant was never identified as the driver of the Ford Focus.

> ** B.S. — was only 50% certain of his out-of-court identification of Kiaran Young; further there was no testimony that the Kiaran Young in the lineup was appellant.

> ** Officer Farren — testified that Kiaran Young was driving the black Escape. He also identified that an individual in the courtroom was the driver, but the record does not reflect that the individual he identified was appellant.

> ** J.F. — was only 50% certain of his out-of-court photo identification of Kiaran Young. No one identified appellant in the courtroom as being the person in the photo lineup or involved in the incident with J.F.

28

** Debbie Papp — identified Kiaran Young from a photo lineup with 100% certainty, but made no in-court identification.

** Some of the individuals depicted in the photo arrays did not match the description of the perpetrator.

{¶ 43} Appellant contends that while in-court identifications were made of an individual in the courtroom, the record does not reflect that the individual was appellant. In addition, where an out-of-court photo identification was made, the witnesses did not state that the individual in the photo was appellant in the courtroom. Moreover, appellant was wearing a mask over his face during the courtroom proceedings pursuant to the court's administrative order regarding the COVID-19 pandemic and was never asked to remove his mask.

{¶ 44} The state argues that appellant admitted that he was driving the stolen Ford Focus when he fled from police and crashed the car and escaped in the stolen Ford Escape. In addition, appellant admitted that the iPhone recovered from the black Ford Escape was his and admitted that he drove and aided in the robbery of J.F.

{¶ 45} Appellant was identified by Ms. Ouedrago, Ms. Wesley, Ms. Graves, J.F., B.S., and Ms. Papp. While the state did not ask for the record to reflect that appellant had been identified by the witnesses, the jury was present in the courtroom and was able to see the individual that the witnesses had described. In addition, the photo arrays were admitted into evidence.

{¶ 46} Moreover, photos from appellant's phone and Facebook account show that he was in the stolen Ford Focus with his codefendants, brandishing firearms. There was additional evidence where appellant was seen and identified as driving the black Ford Focus, and some of his property, including his underwear that contained his DNA, was recovered from the Focus.

{¶ 47} When analyzing a claim of sufficiency of the evidence, a reviewing court is neither permitted to assess the credibility of witnesses nor otherwise weigh the evidence. *In re A.W.*, 8th Dist. Cuyahoga No. 103269, 2016-Ohio-7297, ¶ 33. "The resolution of conflicting testimony and the credibility of the witnesses remains within the province of the trier of fact." *Id.*, citing *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus.

{¶ 48} We find that there was sufficient evidence to support appellant's convictions, and appellant's first assignment of error is overruled.

*State v. Young*, 2022-Ohio-3132, 2022 WL 4100967, at **5-7.

The Due Process Clause of the Fourteenth Amendment requires that a criminal conviction be supported by proof beyond a reasonable doubt with respect to every fact necessary to constitute the offense

charged. *In re Winship*, 397 U.S. 358, 363–64, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). The standard for

determining if a conviction is supported by sufficient evidence is "whether after reviewing the evidence in

the light most favorable to the prosecution, any rational trier of fact could have found the essential elements

of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 317, 99 S.Ct. 2781, 61 L.Ed.2d

560 (1979). In making such a determination, a district court may not substitute its own determination of

guilt or innocence for that of the factfinder, nor may it weigh the credibility of witnesses. *Id. See also*

*Walker v. Engle*, 703 F.2d 959, 970 (6th Cir. 1983). Moreover, federal courts are required to give deference

to factual determinations made in state court and "[a]ny conflicting inferences arising from the record ...

should be resolved in favor of the prosecution." *Heinish v. Tate*, 1993 WL 460782, at *3 (6th Cir. 1993)

(citing *Walker*, 703 F.3d at 969–70.) *See also Wright v. West*, 505 U.S. 277, 296, 112 S.Ct. 2482, 120

L.Ed.2d 225 (1992) (the deference owed to the trier of fact limits the nature of constitutional sufficiency

review.)

     Consistent with these principles, the Supreme Court has emphasized that habeas courts must review

sufficiency of the evidence claims with "double deference:"

> We have made clear that *Jackson* claims face a high bar in federal habeas
> proceedings because they are subject to two layers of judicial deference. First,
> on direct appeal, 'it is the responsibility of the jury—not the court—to decide
> what conclusions should be drawn from evidence admitted at trial. A
> reviewing court may set aside the jury's verdict on the ground of insufficient
> evidence only if no rational trier of fact could have agreed with the jury.'
> *Cavazos v. Smith*, 565 U.S. 1, ——, 132 S.Ct. 2, 4, 181 L.Ed.2d 311 (2011)
> (*per curiam*). And second, on habeas review, 'a federal court may not
> overturn a state court decision rejecting a sufficiency of the evidence
> challenge simply because the federal court disagrees with the state court. The
> federal court instead may do so only if the state court decision was
> 'objectively unreasonable.'" *Ibid.* (quoting *Renico v. Lett*, 559 U.S. 766, ——
> –, 130 S.Ct. 1855, 1862, 176 L.Ed.2d 678 (2010)).

*Coleman v. Johnson*, 566 U.S. 650, 132 S.Ct. 2060, 2062, 182 L.Ed.2d 978 (2012). Under this standard,

"we cannot rely simply upon our own personal conceptions of what evidentiary showings would be

sufficient to convince us of the petitioner's guilt," nor can "[w]e ... inquire whether any rational trier of fact

would conclude that petitioner ... is guilty of the offenses with which he is charged." *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009). Rather, a habeas court must confine its review to determining whether the state court "was unreasonable in its conclusion that a rational trier of fact could find [petitioner] guilty beyond a reasonable doubt based on the evidence introduced at trial." *Id.* (emphasis in original) (citing *Knowles v. Mirzayance*, 556 U.S. 111, 129 S.Ct. 1411, 1420, 173 L.Ed.2d 251 (2009)).

Upon careful review of the trial transcript, the Court finds the state appellate court reasonably determined Young's convictions were supported by sufficient evidence. In resolving Young's sufficiency of the evidence claim, the state appellate court accurately summarized the evidence and correctly identified the applicable law. As the state appellate court noted, Ms. Ouedrago, Ms. Wesley, Ms. Graves, Mr. Veal, J.F., B.S., and Ms. Papp identified Young as being involved in the crimes. (Doc. No. 6-2, PageID# 732, 875-78, 912-13, 937-38, 995-98, 1148-49, 1217-18, 1229-34, 1329-30, 1348-49, 1388-89.) While the state failed to ask for the record to reflect that Young had been identified by the witnesses, the jury could see the individual that the witnesses had described, and the trial court admitted the photo arrays into evidence. (*Id.* at PageID# 1270-76, 1596-1605.) In addition, underwear containing Young's DNA was found in the stolen black Ford Focus. (*Id.* at PageID# 844, 1111, 1116-17, 1512-13.) Photos from Young's phone and Facebook account showed him in the stolen vehicles with his codefendants, brandishing firearms. (*Id.* at PageID# 863-64, 1486-1512, 1523-31, 1567-69.) Police officers arrested Young after pursuing a stolen car, which ultimately crashed. (*Id.* at PageID# 747-56, 758-68.) When Young was arrested, he was wearing the Gucci belt stolen from J.F. (*Id.* at PageID# 798, 800.) In addition, appellant admitted that the iPhone recovered from underneath the black Ford Escape was his and admitted that he drove and aided in the robbery of J.F. (*Id.* at PageID# 810-11, 854-56, 861-62, 1198-1203.) Young also admitted to being involved in an incident on the morning of November 2, 2016. (*Id.* at PageID# 1575-76.) The license plate found on

the stolen silver Ford Escape was registered to Valerie Johnson, Young's grandmother.  (*Id.* at PageID# 1578.)

It is not for this Court to weigh evidence or determine credibility.  *See Jackson*, 443 U.S. at 317-19; *Coleman*, 566 U.S. at 651.  While Young interprets evidence in a light most favorable to him, that is not the standard – the Court must view the evidence in a light most favorable to the prosecution.  *Jackson*, 443 U.S. at 319.

Under the "doubly deferential" standard, the Court cannot say the state court "was unreasonable in its conclusion that a rational trier of fact could find [petitioner] guilty beyond a reasonable doubt based on the evidence introduced at trial."  *Brown v. Konteh*, 567 F.3d at 205.  Accordingly, it is recommended the Court find Ground One lacks merit.

### 2.    Ground Two

In Ground Two, Young argues that he was denied due process and a fair trial when the trial court allowed the in-court identification of Young by Ms. Wesley, when she had been unable to identify him before in an out-of-court photo lineup.  (Doc. No. 1 at 7.)  Young asserts Ms. Wesley had been unable to identify him in photo arrays "just several days after she was carjacked," "[y]et five years later at trial she was suddenly able to make an in-court identification of [him]."  (*Id.*)  In addition, the trial took place during COVID, Young wore a mask during court proceedings, and was never asked to remove his mask.  (*Id.*)

Respondent argues that as the state appellate court's rejection of this claim was not contrary to or an unreasonable application of clearly established federal law regarding witness identifications, the state appellate court's determination is entitled to deference under the AEDPA.  (Doc. No. 6 at 32.)  Respondent asserts that Young makes no argument that the "pretrial identification process was impermissibly suggestive or created a likelihood of misidentification."  (*Id.* at 34.)  Therefore, the Court's inquiry ends there.  (*Id.*)  However, Respondent argues that even if the Court were to address the reliability of the in-court

32

identification, "the totality of the circumstances shows that the victim's identification was reliable enough to present to the jury for its determination." (*Id.* at 35-37.) Therefore, Young fails to show that his constitutional rights were violated. (*Id.* at 37.)

As Young failed to file a Traverse, Respondent's arguments are unopposed.

Young raised a witness identification claim to both the state appellate court and the Supreme Court of Ohio. (Doc. No. 6-1, Ex. 20, 26.) The state appellate court considered this claim on the merits and rejected it as follows:

{¶ 53} In his third assignment of error, appellant argues that the trial court abused its discretion or plainly erred by allowing the in-court identification of appellant by Ms. Wesley when she was unable to identify him in an out-of-court photo lineup several days after the incident in question.

{¶ 54} A trial court has broad discretion to admit or exclude evidence. *State v. Thompson,* 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, ¶ 111. An admissibility ruling will not be reversed unless there has been an abuse of discretion and the defendant has thereby suffered material prejudice. *Id.*

{¶ 55} "An identification derived from unnecessarily suggestive procedures, which have a likelihood of leading to a misidentification, violates a defendant's right to due process." *State v. Fields*, 8th Dist. Cuyahoga No. 99750, 2014-Ohio-301, ¶ 10, citing *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). Generally, an in-court identification will be upheld "where the totality of the circumstances demonstrates that the in-court identification was reliable." *State v. Gales*, 8th Dist. Cuyahoga No. 102809, 2016-Ohio-588, ¶ 30, citing *State v. Monford*, 190 Ohio App.3d 35, 2010-Ohio-4732, 940 N.E.2d 634, ¶ 58 (10th Dist.).

{¶ 56} This court has held that even if a pretrial identification procedure, such as a photo array or a lineup, was impermissibly suggestive, an in-court identification is permissible if the state establishes by clear and convincing evidence that the witness had a reliable, independent basis for the identification based on prior independent observations made at the scene of the crime. *State v. Thomas*, 8th Dist. Cuyahoga No. 88548, 2007-Ohio-3522, ¶ 20; *State v. Jackson*, 8th Dist. Cuyahoga No. 88345, 2007-Ohio-2925, ¶ 43; *State v. Tate*, 8th Dist. Cuyahoga No. 81577, 2003-Ohio-1835, ¶ 24; *In re Henderson*, 8th Dist. Cuyahoga No. 79716, 2002 WL 207611, 2002 Ohio App. LEXIS 452 (Feb. 7, 2002). In *State v. Jackson,* 26 Ohio St.2d 74, 269 N.E.2d 118 (1971), the Supreme Court of Ohio explained that in determining the admissibility of an in-court identification, trial courts should consider whether the in-court identification was a product of an improper pretrial

identification procedure or whether the in-court identification "came from some independent recollection and observation of the accused by the witness." *Id.* at 77, 269 N.E.2d 118.

{¶ 57} In analyzing the potential for misidentification, courts consider:

> "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation."

*State v. Harris*, 8th Dist. Cuyahoga No. 109060, 2021-Ohio-856, ¶ 2, quoting *Biggers* at 199-200, 93 S.Ct. 375. The court must review these factors under the totality of the circumstances. *Id.*

{¶ 58} Here, Ms. Wesley's in-court identification was based on her own observations and memory. She testified under oath and was subject to cross-examination about her identification of appellant. She stated that she originally saw him as the driver of the vehicle behind her. She further testified that after the vehicle behind her bumped her silver Escape, she got out to see if there was damage and again observed appellant as the driver.

{¶ 59} When questioned about her confident in-court identification in light of her prior inability to identify appellant in the days following the incident, Ms. Wesley stated that she was shaken up in the days after the incident, but the event has replayed in her head in the five years since. On cross-examination, appellant's trial counsel asked Ms. Wesley whether it was possible she was "ID-ing [appellant] because he's sitting at the table here today?" She responded, "No." She further denied that anyone she knew had put appellant's name in her head.

{¶ 60} The foregoing evidence, when viewed under the totality of the circumstances, does not indicate that the identification procedure was unduly suggestive or unreliable. Any issues regarding Ms. Wesley's inability to identify appellant days after the incident and make a certain identification five years later while appellant was wearing a mask in the courtroom was an issue of credibility for the jury to determine, and it is apparent that the jury did indeed believe her. *See State v. Dennis*, 10th Dist. Franklin No. 05AP-1290, 2006-Ohio-5777, ¶ 13 (witnesses' trial identifications of defendant, despite prior failures to identify defendant in photo arrays entered into evidence, presented credibility determinations for the jury); *State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964) (It is the province of the jury to "believe or disbelieve any witness or accept part of what a witness says and reject the rest.").

{¶ 61} The trial court did not abuse its discretion in allowing the admission of Ms. Wesley's in-court identification of appellant, and the third assignment of error is overruled.

*State v. Young*, 2022-Ohio-3132, 2022 WL 4100967, at **7-9.

The United States Supreme Court has held that an identification violates a defendant's right to due process where the procedure was so unnecessarily suggestive as to run the risk of irreparable mistaken identification. *Stovall v. Denno*, 388 U.S. 293, 301-02 (1967) (*overruled on other grounds by Griffith v. Kentucky*, 479 U.S. 314 (1988)); *Neil v. Biggers*, 409 U.S. 188 (1972); *see also Thigpen v. Cory*, 804 F.2d 893, 895 (6th Cir. 1986). "It is the likelihood of misidentification which violates a defendant's right to due process." *Biggers*, 409 U.S. at 198. As the Supreme Court has stated, "reliability is the linchpin in determining the admissibility of identification testimony." *Manson v. Braithwaite*, 432 U.S. 98, 114 (1977).

The admissibility of identification evidence is governed by a two-step test. First, the defendant bears the burden of proving the identification procedure was impermissibly suggestive. *United States v. Hill*, 967 F.2d 226, 230 (6th Cir.1992); *Simmons v. United States*, 390 U.S. 377, 384 (1968). Only if the defendant meets this initial burden of proof must the court then proceed to the second step and determine whether, under the totality of circumstances, the identification was nevertheless reliable. *Id; see also Moore v. United States*, Case No. 97-4125, 1998 WL 537589 (6th Cir. 1998) (In a § 2255 proceeding, the petitioner did not show that a line-up was impermissibly suggestive and the district court properly rejected the claim without reaching the reliability question.)

Suggestiveness generally depends "upon whether the witness's attention was directed to a suspect because of police conduct." 2-5 Crim. Con. Law § 5.05(2)(b) (2004). In considering this, federal courts look to the effects of the circumstances of the pretrial identification, not whether law enforcement officers intended to prejudice a petitioner. *Thigpen*, 804 F.2d at 895. In examining whether the identification procedure was impermissibly suggestive, the "primary evil to be avoided is a very substantial likelihood of

irreparable misidentification." *Biggers,* 409 U.S. at 198, 93 S.Ct. 375, 34 L.Ed.2d 401 (*citing Simmons v. United States,* 390 U.S. 377, 384 (1968)).

If the identification is deemed to be unduly suggestive, the court moves on to consider the reliability of the identification. In determining the reliability of an identification, the court considers the totality of the circumstances, including (1) the witness's opportunity to view the defendant at the initial observation, (2) the witness's degree of attention, (3) the accuracy of the witness's prior description of the defendant, (4) the witness's level of certainty at the pretrial identification, and (5) the length of time between the initial observation and the identification. *Id.* at 472 (*citing Manson v. Brathwaite,* 432 U.S. 98 (1977); *Biggers,* 409 U.S. at 199-200; *see also Howard v. Bouchard,* 405 F.3d 459, 472 (6th Cir. 2005). These factors must be weighed against any "corrupting effect of the suggestive identification." *Manson,* 432 U.S. at 114.

"If the defendant fails to show that the identification procedures were impermissibly suggestive, or if the totality of the circumstances indicates that the identification was otherwise reliable, then no due process violation has occurred." *Hill,* 967 F.2d at 230 (*quoting United States v. Causey,* 834 F.2d 1277, 1285 (6th Cir. 1987).

In *United States v. Hill,* the Sixth Circuit allowed a witness, who had never before positively identified the defendant, make an identification in court five years after the crime. *Hill*, 967 F.2d at 232. It applied *Biggers* to an in-court identification as "[a]ll of the concerns that underlie the *Biggers* analysis, including the degree of suggestiveness, the chance of mistake, and the threat to due process are no less applicable when the identification takes place for the first time at trial." *Id.* The Sixth Circuit assumed that the in-court identification of defendant was impermissibly suggestive and then considered the reliability factors. *Id.* at 232. The *Hill* court determined that the identification was sufficiently reliable and that the district court had properly left it to the jury to decide what weight to ultimately give to the identification. *Id.* at 232-33. Also, the defense was free to attack the reliability of the identification vigorously and to present

its arguments to the jury. *Id.* at 233. The Sixth Circuit concluded that the witness was properly allowed to identify the defendant in court. *Id.*

Here, despite being presented with photo arrays, Wesley did not identify Young in any of the photo arrays before trial. (Doc. No. 6-2, PageID# 1155-60.) However, on the day of the carjacking, Wesley described the driver as having shoulder length dreads. (*Id.* at PageID# 1299.) Wesley testified at trial that as she was at the intersection of Miles and 146th or 147th, she noticed Young, the driver, behind her. (*Id.* at PageID# 1148, 1160.) Wesley identified Young as being in court and wearing a black shirt with a mask and dreads. (*Id.*) She testified that, on the day of the carjacking, she was somewhat paying attention as her car and Young's car went around the curve together. (*Id.* at PageID# 1148-49.) Wesley further testified that Young hit her from behind at the intersection of 93rd and Miles. (*Id.* at PageID# 1150.) She parked the car and got out of it, at which time she saw Young. (*Id.* at PageID# 1151.) Another man came around the front of the car, put a gun to her face, and said he needed her car. (*Id.*) Wesley "immediately" walked away, and as she did so, she saw the man with the gun drive off in her car and Young followed behind in the other car. (*Id.*) On cross-examination, defense counsel asked Wesley about her inability to identify Young before trial and her ability to identify him in court five years later. (*Id.* at PageID# 1163-66.) Wesley testified that having a gun in her face caused her to replay that day in her head every day. (*Id.* at 1163.) She further testified that five days after the carjacking, she was still shaken up and trying to remember everything, and she was traumatized and scared by being in the police department. (*Id.* at PageID# 1163-66.) However, once she went home, it continued to play in her head every day for the past five years. (*Id.* at 1164.) She denied anyone putting a name in her head. (*Id.*) Wesley denied identifying Young because he was sitting at the defense table that day. (*Id.* at PageID# 1166.) In addition, other evidence presented at trial corroborated the reliability of Wesley's identification, including that the license plate found on the stolen silver Ford Escape was registered to Valerie Johnson, Young's grandmother (*id.* at PageID# 1578).

37

*See Keene v. Mitchell*, 525 F.3d 461, 466 (6th Cir. 2008). Therefore, the first four *Biggers* factors support the reliability of Wesley's in-court identification.

As in *Hill*, "[t]he fifth factor does detract somewhat from the reliability of [Wesley's] identification," as five years had passed between the carjacking and the in-court identification. *Hill*, 967 F.2d at 233. Even with a five-year delay, the Court cannot say, considering the totality of the circumstances of this case, that there is "a very substantial likelihood of irreparable misidentification." Short of that point, it is up to the jury to weigh the strength of Wesley's testimony. *See Manson,* 432 U.S. at 105 (*citing Simmons v. United States,* 390 U.S. 377, 395-96 (1969)). Defense counsel attacked the reliability of Wesley's in-court identification and was free to present its arguments to the jury. *Hill*, 967 F.2d at 233. No due process violation occurred.

### 3.   Ground Seven

In Ground Seven, Young argues he was denied due process and a fair trial in violation of the Sixth and Fourteenth Amendments when the trial court refused to dismiss counsel or allow counsel to withdraw, even after Young had filed an ethics grievance against his counsel. (Doc. No. 1 at 13.) Young filed a motion to dismiss counsel, in which he argued that counsel had not spoken to him for months, had filed continuances to which Young had not agreed, had not shown Young discovery from the State, and had not been working in Young's best defense. (*Id.*) Counsel then filed a motion to withdraw, citing as grounds Young's motion to dismiss and Young's statement to counsel that Young had filed a grievance against him with the bar association. (*Id.*) After a hearing, the trial court denied both motions, "forcing counsel to continue to represent Petitioner at trial." (*Id.*)

Respondent argues that the state appellate court "reasonably rejected Young's federal constitutional violation claim in accord with clearly established Supreme Court precedent, and this Court must defer to that determination" under AEDPA. (Doc. No. 6 at 51.)

38

As Young failed to file a Traverse, Respondent's arguments are unopposed.

Young raised this claim to both the state appellate court and the Supreme Court of Ohio.  (Doc. No.

6-1, Ex. 20, 26.)  The state appellate court considered this claim on the merits and rejected it as follows:

{¶ 89} In his eighth assignment of error, appellant argues that the trial court erred by refusing to dismiss his counsel and/or grant his counsel's motion to withdraw when appellant had an ethical grievance pending against trial counsel.

{¶ 90} One month before trial was set to commence, appellant filed a motion to dismiss counsel, asserting that his trial counsel had not spoken with him for months, pushed continuances that he had not consented to, had not shown appellant the discovery received from the state, and had not been working in his best defense.

{¶ 91} Trial counsel also filed a motion to withdraw, based partly upon appellant's motion to dismiss counsel, and also asserting that appellant had stated to counsel that he had filed a grievance against him. Trial counsel maintained that he was ethically prohibited from continuing to represent appellant.

{¶ 92} Trial counsel stated that he did not feel comfortable representing appellant while a grievance was pending against him but iterated that if he were kept on the case he would "show up and fight for" appellant.

{¶ 93} The trial court held a hearing on the motions where trial counsel stated his belief, based upon conversations with disciplinary counsel, that he could not represent appellant while an ethical grievance was pending. The court asked appellant about the grievance, who confirmed that he had filed one with the bar association based upon ineffective assistance of counsel. Following the hearing, the trial court denied both motions without analysis.

{¶ 94} Appellant argues that because a grievance was pending, he and his trial counsel were at odds in an ethical matter, and thus he demonstrated good cause to receive different appointed counsel.

{¶ 95} The state, who did not object to the motions and deferred to the court's ruling, asserts that appellant did not demonstrate a breakdown of the attorney-client relationship and that no grievance was ever put on the record. The state further notes that the issue of a bar complaint was never asserted again, despite the fact that the matter was not tried until three months after the court's denial of the motions.

{¶ 96} As noted by this court:

It is well established that an indigent defendant is not entitled to the counsel of his choosing, but rather, only the right to competent, effective representation. *See* [*State v. Murphy*, 91 Ohio St.3d 516, 523, 747 N.E.2d 765 (2001)]. Further, the right to counsel does not guarantee the defendant a meaningful relationship with counsel. *See Morris v. Slappy* (1983), 461 U.S. 1, 13-14, 103 S.Ct. 1610, 75 L.Ed.2d 610; *State v. Pruitt* (1984), 18 Ohio App.3d 50, 57, 480 N.E.2d 499. In order for a criminal defendant to discharge a court-appointed attorney, the defendant must show a breakdown in the attorney-client relationship of such magnitude as to jeopardize the defendant's right to the effective assistance of counsel. *See State v. Coleman* (1988), 37 Ohio St.3d 286, 525 N.E.2d 792, paragraph four of the syllabus. Thus, an indigent defendant is entitled to new counsel "only upon a showing of good cause, such as a conflict of interest, a complete breakdown in communication, or an irreconcilable conflict which leads to an apparently unjust result." *State v. Edsall* (1996), 113 Ohio App.3d 337, 339, 680 N.E.2d 1256; *see, also, State v. Blankenship* (1995), 102 Ohio App.3d 534, 558, 657 N.E.2d 559.

*State v. Stewart*, 2018-Ohio-684, 101 N.E.3d 688, ¶ 13 (8th Dist.), quoting *State v. Hawkins*, 8th Dist. Cuyahoga No. 91930, 2009-Ohio-4368, ¶ 63.

{¶ 97} This court reviews a trial court's decision on a motion to withdraw as counsel for an abuse of discretion. *State v. Williams*, 99 Ohio St.3d 493, 2003-Ohio-4396, 794 N.E.2d 27, ¶ 135. Similarly, we review a trial court's decision regarding a defendant's request for substitute counsel (or in this case a motion to dismiss counsel) for an abuse of discretion. *Hawkins* at *id.*, citing *Murphy* at *id.*

{¶ 98} In *State v. Deal*, 17 Ohio St.2d 17, 244 N.E.2d 742 (1969), the Supreme Court of Ohio held that when an indigent defendant questions the effectiveness and adequacy of assigned counsel and requests new counsel, the trial court has a duty to inquire into the defendant's complaint and request and to make the inquiry a part of the record. *Id.* at syllabus. Subsequently, in *State v. Johnson*, 112 Ohio St.3d 210, 2006-Ohio-6404, 858 N.E.2d 1144, the court explained that "'the limited judicial duty [to inquire into a defendant's complaint about adequacy or effectiveness of counsel] arises only if the allegations are sufficiently specific; vague or general objections do not trigger the duty to investigate further.'" *Id.* at ¶ 68, quoting *State v. Carter*, 128 Ohio App.3d 419, 423, 715 N.E.2d 223 (4th Dist.1998).

{¶ 99} In this case, the trial court did, in fact, conduct an inquiry regarding appellant's concerns during a hearing held on the motions. Specifically, the trial court inquired about the conflicts between appellant and counsel, the communication issues, and appellant's grievance that he said he filed with the bar association.

40

{¶ 100} After reviewing the record, we find no basis to conclude that the trial court abused its discretion in denying counsel's motions to withdraw or appellant's motion to dismiss counsel. The record does not reflect a complete breakdown in communications or irreconcilable conflict between appellant and counsel that jeopardized appellant's right to the effective assistance of counsel. Indeed, trial counsel stated that if he were to remain on the case, he would "show up and fight for" appellant.

{¶ 101} We further note that over two months after the motions were filed, trial was set but did not go forward that day due to a conflict with the court's calendar. However, on this day, the parties appeared in court and appellant's trial counsel stated that he had met with appellant in the jail the weekend prior and appellant was "adamant" that he wanted to go forward with trial. There was no further mention of any grievance or breakdown between appellant and his counsel. Trial in this matter did not occur until nearly two months later, and in this time, there was no further mention of any issue with appellant's counsel.

{¶ 102} Accordingly, there is no evidence in the record that the differences, conflict, or communication issues between the two prevented counsel from rendering effective assistance. While appellant's appeal does raise issues of ineffective assistance of counsel, these were found to be without merit and did not relate to the issues raised by appellant in his motion to dismiss.

{¶ 103} Appellant's eighth assignment of error is overruled.

*State v. Young*, 2022-Ohio-3132, 2022 WL 4100967, at **13-15.

In order to establish ineffective assistance of counsel, a petitioner must demonstrate that his counsel's conduct was so below acceptable standards of representation that counsel was not functioning as "counsel" guaranteed by the Sixth Amendment to the United States Constitution. *See Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). A petitioner also must demonstrate that a trial counsel's performance prejudiced the petitioner's defense to such an extent that it rendered the proceeding unfair. *Id.* To establish prejudice, the "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. In other words, a counsel's deficient performance must have "caused the defendant to lose what he otherwise would probably have won" and it must have been "so manifestly ineffective that

41

defeat was snatched from the hands of probable victory." *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992).

"[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. Mere disagreements by a defendant with tactics or strategies employed by counsel are not enough to support a claim of ineffective assistance of counsel and there is a presumption that the challenged conduct of a petitioner's counsel was a matter of strategy. *Id.* at 689. *See also United States v. Perry*, 908 F.2d 56, 59 (6th Cir. 1990).

As explained by the United States Supreme Court:

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id.*, at 689, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674; *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles*, 556 U.S., at ——, 129 S.Ct. 1411, 173 L.Ed.2d 251. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at ——, 129 S.Ct. 1411, 173 L.Ed.2d 251. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland* 's deferential standard.

*Harrington*, 562 U.S. at 105. *See also Kennedy v. Warren*, 428 F. App'x 517, 520 (6th Cir. 2011); *Phillips v. Sheldon*, 2014 WL 185777, at **14-15 (N.D. Ohio Jan. 16, 2014).

"The Sixth Amendment guarantees that '[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the assistance of Counsel for his defense.' U.S. Const. Amend. VI. The Supreme Court has held that although the Sixth Amendment does not entitle an indigent criminal defendant to his counsel of choice, it does guarantee him a right to adequate representation. *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624 (1989)." *Cody v. McConahay*, 2022 WL 1572573, at *6 (6th Cir. Jan. 7, 2022). As the state appellate court recognized, "the right to counsel does not include a right to a meaningful or

peaceful relationship between counsel and the defendant." *See Morris v. Slappy*, 461 U.S. 1, 13 (1983). "A motion for new court appointed counsel based upon defendant's dissatisfaction with his counsel previously appointed is addressed to the sound discretion of the trial court." *Edsall v. Lazaroff*, 208 F.3d 213 (6th Cir. 2000) (citing *United States v. White,* 451 F.2d 1225 (6th Cir. 1971)).

As the state appellate court noted, the trial court held a hearing on Young's motion to dismiss appointed counsel and trial counsel's motion to withdraw. (Doc. No. 6-2, PageID# 473-87.) Trial counsel told the trial court that he filed his motion to withdraw based on his discussions with Young and Young's filing a grievance against him. (*Id.* at PageID# 474.) Trial counsel represented he had been advised by disciplinary counsel that he could not continue to represent a client once a grievance had been filed, and so he needed to withdraw on ethical grounds. (*Id.* at PageID# 474-75.) Trial counsel further stated:

> Let me say this. I went to see Mr. Young I think a couple – two times in the jail since then in an effort to attempt to rehabilitate our relationship. Our meetings have been cordial. Almost friendly I would describe them as. But he's adamant that he wants new counsel, that he's not going to withdraw his grievance against me.

(*Id.* at 475.)

The record reflects the following exchange from between Young, trial counsel, and the trial court:

> THE COURT: Mr. Young, I think your motion to dismiss Pagano was actually filed before his motion to withdraw. But is it accurate that you have filed a grievance against him with the Bar Association?
>
> THE DEFENDANT: Yes.
>
> THE COURT: On what grounds?
>
> THE DEFENDANT: Ineffective counsel.
>
> THE COURT: Well, I'm not sure that the Bar Association can do anything about that claim at this stage of the case. In other words, the case is -- well, let me back up. You actually filed the motion to dismiss I think only in the corrupt activity case. So I will just refer to it as the case. Until a case is

concluded, I don't think the Bar Association would ever step in and weigh in on the question of whether counsel have been ineffective.

Are you, though, in your grievance with the Bar Association, are you mentioning the same thing that you mentioned in your motion here, namely unprofessional errors by not coming to see you, speak with you for months, and pushing continuances at your request when you haven't consented to them?

THE DEFENDANT: Yes.

THE COURT: Anything else?

THE DEFENDANT: No.

THE COURT: Mr. Young and Mr. Pagano, these decisions would be relatively easy I think if this case were a month or two old, but the case is – it's going on four years. In fact, the indictment may be longer than four years ago. Well, I'm sorry. The indictment was returned three and a half years ago. Mr. Pagano, I wasn't around at the time. Were you assigned from the start or did you replace original counsel at some point?

MR. PAGANO: Your Honor, I have been Mr. Young's representation from the beginning.

THE COURT: That's what I thought. Is there anything, Mr. Young, that is not listed in your motion that was filed on May 20 that you want me to take into account in deciding whether to grant your motion?

THE DEFENDANT: No.

THE COURT: And, Mr. Pagano, same question for you. Other than what you have well, in addition to what you mentioned at this hearing and in addition to what you mentioned in your motion, is there anything else you want me to take into account?

MR. PAGANO: Your Honor, yes. I just would like to say that I take my representation of my clients seriously. I was prepared to go forward on the day we had trial. I think Ms. Sowul and Mr. Bokoch can attest to the fact that I had my file worked up. I was here. I was ready to go.

If the Court keeps me on the case, I will show up and I will fight for Mr. Young. I would just ask that if the Court is leaning towards not granting my motion, if possibly we could move the trial date back another month or so I can attempt to get this Bar complaint sorted out. Because if there's a pending Bar complaint against me, I don't feel comfortable actually trying the case while there's a pending Bar complaint.

44

(*Id.* at PageID# 476-79.)

Trial counsel informed the trial court that Young was willing to sign a speedy trial waiver if the trial court were to remove counsel.  (*Id.* at PageID# 481.)  The trial court then addressed Young as follows:

> THE COURT: The question of speedy trial, Mr. Young -- well, first of all, I don't really know what happened before this case was mine. If, however, your statutory speedy trial right has been violated -- if. That's a big if -- then it probably was before judges were changed. I'm not saying that it was, but I'm saying if a Court were to decide that it has been violated, it seems to me it would have happened before you and I met. Over the past approximately a year -- and I am going approximate -- any continuances are probably solid because of COVID.
>
> And then, of course, if you need a new lawyer, implicitly you're consenting to an extension of the statutory speedy trial time because you can't hire a new lawyer on Monday and have him or her try the case on Tuesday.
>
> The other thing is the issue that you raise, ineffective assistance, is typically viewed once there's a conclusion to the case. For example -- well, let me say first, I don't offer an opinion on whether Mr. Pagano has been effective or ineffective. I will assume, absent evidence to the contrary, that he's been effective. But a lawyer can be ineffective and a client still get a good result, meaning no harm, no foul. The point is effectiveness of counsel is generally judged once there is an outcome. Here there has been no outcome. There hasn't been a change of plea proposed where, for example, you are forced to take a lousy plea deal because your lawyer did a bad job. There certainly hasn't been a trial where you were found guilty because your lawyer did a bad job or anything like that. So that's a reason why I'm struggling with this is it's -- it might be premature.
>
> On the other hand, if you are not confident that your lawyer is representing you effectively, the Court, as a general proposition, has an interest in people being confident that they're treated fairly. And so the question in that case would be what would be the harm of getting a new lawyer.
>
> There are a few answers to that question, but the point is these, Mr. Young, are the things I'm resting [sic] with in deciding whether to grant or deny these requests. So let me think about it for a few days or so.

(*Id.* at PageID# 481-83.)

On June 24, 2021, the trial court denied both motions.  (Doc. No. 6-1, Ex. 6-7.)  As the state appellate court noted, three months passed before the case proceeded to trial (Doc. No. 6-2, PageID# 511), and neither

Young nor trial counsel renewed the issue of trial counsel's continued representation with the trial court. The trial transcripts reveal that Young's counsel presented a strong defense of his client, including challenging the issue of identity.

Therefore, the undersigned recommends the Court find that the state appellate court's rejection of this claim is not contrary to, or an unreasonable application of, clearly established federal law, and dismiss Ground Seven as meritless.

### VI.    Conclusion

For all the reasons set forth above, it is recommended that the Petition be DENIED.

Date: May 21, 2025                                            *s/ Jonathan Greenberg*
                                                              Jonathan D. Greenberg
                                                              United States Magistrate Judge

### **OBJECTIONS**

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *Berkshire v. Beauvais*, 928 F.3d 520, 530-31 (6th Cir. 2019).**